# United States Court of Appeals
## For the First Circuit

No. 23-1709

STATE OF MAINE,

Plaintiff, Appellee,

v.

3M COMPANY, INC.,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. John A. Woodcock, Jr., U.S. District Judge]

Before

Montecalvo, Lynch, and Thompson,
Circuit Judges.

Paul Clement, with whom Michael A. Scodro, Gary A. Isaac, Avi
M. Kupfer, Carmen N. Longoria-Green, Jay S. Geller, and Russell B.
Pierce, Jr. were on brief, for appellant.

Matthew F. Pawa, with whom Benjamin A. Krass, Scott Boak,
Robert Martin, and Kyle J. McGee were on brief, for appellee.

November 19, 2025

**LYNCH**, <u>Circuit Judge</u>.  Seeking redress for the effects of forever chemicals on the environment, the State of Maine brought two almost-identical suits against 3M Company, alleging that per- and polyfluoroalkyl substances (PFAS) made by 3M had contaminated resources "in locations throughout Maine."  Maine alleged that 3M's PFAS contaminated Maine's groundwaters, surface waters, wetlands, drinking water supplies, and other natural resources including the State's fish, wildlife, biota, air, soil, and sediment.  Maine sought wide-ranging relief, including compensatory and punitive damages, investigation and monitoring costs, and incurred expenses for contamination remediation and natural resource restoration.

Maine chose to file in its state court these two PFAS complaints on March 29, 2023.  In one suit, Maine sought to recover for PFAS contamination caused by 3M's production of Aqueous Film Forming Foam ("AFFF"), a firefighting material that contains PFAS (the "AFFF Complaint"), while in the other, Maine sought to recover for PFAS contamination not caused by 3M's production of AFFF (the "non-AFFF Complaint").  Some AFFF was produced at the instruction of the U.S. military ("MilSpec AFFF") and has been used at military facilities in Maine and elsewhere.[1]  If Maine had sued 3M for PFAS

_____

[1] MilSpec AFFF was not used exclusively by the U.S. military. The U.S. Federal Aviation Administration required that commercial airports certified under 14 C.F.R Part 139 use AFFF meeting MilSpec standards beginning in 2006.

in a single lawsuit, that suit would have readily been removed to federal court because the PFAS contamination included PFAS contained in AFFF, which 3M manufactured and sold to various private and government clients. But Maine chose to bring two suits, one expressly seeking recovery for PFAS contamination deriving from 3M's production of AFFF, while purporting to disclaim all AFFF-related recovery in the non-AFFF suit. Maine sought to avoid removal to federal court pursuant to the federal officer removal statute of what it calls the non-AFFF Complaint by including this disclaimer:

> "The State is not seeking to recover through this Complaint any relief for contamination or injury related to Aqueous Film Forming Foam ["AFFF" or "MilSpec AFFF"], a firefighting material that contains PFAS."

Compl. ¶ 15. The disclaimer applies, Maine says, to both 3M's MilSpec AFFF and other AFFF.

Defendant 3M removed both cases to federal court under the federal officer removal statute, 28 U.S.C. § 1442(a)(1). Maine did not oppose removal of its other suit seeking recovery for PFAS contamination deriving from 3M's production of AFFF.[2] Maine opposed the removal of this non-AFFF case on the grounds, inter alia, that the disclaimer in its Complaint meant that 3M no longer

---

[2] After removal to federal court, Maine's AFFF case was transferred to the U.S. District Court for the District of South Carolina as a tag-along action in In re: Aqueous Film-Forming Foam Products Liability Litigation (MDL No. 2873).

would have a colorable federal defense, as required under the removal statute.

The federal district court agreed with Maine and remanded, reasoning that, by its disclaimer, "the State has taken upon itself the burden as part of its case to demonstrate that the source of contamination in its [n]on-AFFF lawsuit is not a[n] AFFF source." Maine v. 3M Co., No. 2:23-CV-00210-JAW, 2023 WL 4758816, at *10 (D. Me. July 26, 2023). On remand to the state court, "[i]f the factfinder concludes that the State has failed to meet its burden concerning the source, 3M will prevail." Id. Based on this reasoning, the district court concluded that the disclaimer "effectively means that the federal officer defense will not be applicable in the State's [n]on-AFFF lawsuit." Id.

For the reasons which follow, we conclude the remand order was error. Maine's efforts to have two courts answer the same questions must fail. For example, these questions include whether PFAS contamination has commingled with AFFF contamination and so was caused largely or in part by AFFF. We instruct the district court to order this removed non-AFFF case be promptly returned from the State of Maine Superior Court for Cumberland County to the U.S. District Court, which must resume jurisdiction over the case for further proceedings. If 3M moves to transfer this case, including to the ongoing In re: Aqueous Film-Forming Foam Products Liability Litigation (MDL No. 2873) in the U.S.

District Court for the District of South Carolina, and the Judicial Panel on Multidistrict Litigation chooses to transfer this case, then further proceedings will occur in that federal court. The disclaimer does not render 3M's federal defense not "colorable." Further, 3M is entitled, under the removal statute, to have a federal court decide the issues which the district court erroneously reasoned the state court would decide.

## I.

## Procedural History

## A.

We describe allegations in the Complaint in this case, and the further admissions, interrogatory answers, and statements which Maine has made in discovery after remand to state court.[3]

Maine's Complaint alleges that 3M,[4] through its design, manufacture, marketing, distribution, promotion, and sale of PFAS and products including AFFF containing PFAS into Maine, has "directly and proximately caused and continue[s] to cause PFAS to intrude into and contaminate and injure State natural resources and property."[5] The Complaint capaciously defines "the term

---

[3] The parties submitted 28(j) letters to this court which contained information about discovery proceedings in state court.

[4] Maine's Complaint included other defendants: EIDP, Inc.; The Chemours Company; The Chemours Company FC, LLC; DuPont de Nemours, Inc.; Dow Inc.; and Corteva, Inc.

[5] Maine's claims allege contamination by eight specific PFAS chemicals: "perfluorooctanesulfonic acid (PFOS),

'State's natural resources and property'" as "refer[ring] to all natural resources and property for which the State seeks damages, including without limitation fish, wildlife, biota, air, surface water, groundwater, wetlands, drinking water supplies, soil, sediment, public lands the State holds in trust, and State-owned lands" (emphasis added). The Complaint alleges that PFAS contamination became "ubiquitous" and "widespread" throughout Maine because PFAS "enter the environment" through "releases to air, waters, and soil from industrial processes and sites" and from "normal and foreseeable use and disposal" of "products containing PFAS," where they then "persist for an indefinite (and very long) period of time." "[O]nce the[] [PFAS] chemicals are released into the environment, they migrate into and cause extensive contamination and injury of State natural resources and property," as the "PFAS are soluble in water, do not readily adsorb [sic] or stick to soil particles, are mobile in the environment, . . . migrate long distances through soil and groundwater[, and] transport[] long distances through the air." Further, PFAS

_____

perfluorooctanoic acid (PFOA), perfluorononanoic acid (PFNA), perfluorohexanesulfonic acid (PFHxS), perfluoroheptanoic acid (PFHpA), perfluorodecanoic acid (PFDA), perfluorobutane sulfonic acid and its potassium salt (PFBS), and hexafluoropropylene oxide dimer acid and its ammonium salt (GenX)." The Complaint leaves open the potential of including other chemicals, stating that "PFAS contamination is a rapidly developing issue, and additional information (potentially including information on other PFAS chemicals) is expected to come to light over the course of this litigation."

"contamination of the State's natural resources and property . . . is ongoing, as these [PFAS] substances continue to threaten, migrate into, and enter the State's natural resources and property, and cause new contamination in new locations."

The Complaint describes in detail one "known pathway[]" through which PFAS contamination has spread to "sites statewide": via "sludge at wastewater treatment plants and/or in septage from septic systems." The Complaint states that "until recently," sludge and septage was "often used throughout Maine as a soil additive at agricultural sites . . . or in commercial products," and alleges that, for example, "private drinking water wells in Fairfield located near fields fertilized with sludge [have PFAS contamination] at levels hundreds or even more than 1,000 times higher than Maine's recently enacted 20 ppt interim drinking water standard." The land application of sludge and septage has "greatly expanded the area of PFAS contamination and injury in the State," and "[t]he State Legislature has required DEP [the Maine Department of Environmental Protection] to develop and implement a program to evaluate soil and groundwater for PFAS at locations licensed to . . . apply sludge or septage [to land]" because of the "potential for widespread PFAS impacts at these locations."

Maine's original Complaint includes roughly 22 what it called "example" sites it alleges to be contaminated by exclusively non-AFFF PFAS. The Complaint did not limit its case to those

sites, alleging that the State is "continually discover[ing] additional PFAS contamination, including in new locations."[6] For example, the Complaint alleges that PFAS "have contaminated and injured fish, including in Fish Brook in Fairfield, the Presumpscot River in Westbrook, [and] Sheepscot Pond in Palermo," and "other wildlife, including deer."

The Complaint also seeks broad relief for injury under its claims of public, private, and statutory nuisance, common law trespass, strict liability for failure to warn and for design defect and/or defective product, and negligence.[7] The State seeks monetary relief of "compensatory damages . . . for loss of use and enjoyment of State natural resources and property"; investigation, remediation, and treatment costs, including "costs to investigate, monitor, abate, contain, prevent, treat, and remove PFAS from the State's natural resources and property"; and "punitive damages commensurate with Defendants' reprehensible conduct." The Complaint alleges that "absent large-scale and costly remediation and/or treatment," PFAS contamination of "Maine's natural resources and property" "will continue indefinitely, and will

_____

[6] Maine's appellate brief confirms that "the full compilation" of sites at issue in this non-AFFF suit would "occur only in discovery."

[7] Maine also brought claims of actual and constructive fraudulent transfers against the non-3M defendants.

continue to indefinitely threaten [the State's] natural resources and property."

## B.

On May 17, 2023, 3M removed the non-AFFF case to federal court under § 1442(a)(1), the federal officer removal statute, arguing that despite the State's disclaimer, "[t]he alleged PFAS contamination at issue in th[e] [non-AFFF] action plausibly overlaps and is commingled with PFAS from AFFF use at military facilities."  As we describe more fully later, 3M's removal petition must meet three requirements, and 3M has satisfied the statutory requirements for federal officer removal.  See Mesa v. California, 489 U.S. 121 (1989); Jefferson County v. Acker, 527 U.S. 423 (1999).

As to those three requirements, the first is not at issue on appeal because Maine does not dispute that 3M has met the requirement that it "acted under federal authority" in producing PFAS-containing AFFF for the U.S. military and other federally required uses.

As to the second, the "nexus" requirement, 3M alleged that its "actions taken pursuant to a federal officer's direction have a . . . nexus with plaintiff's claims or injuries or are otherwise related to the lawsuit," as Maine's "Complaint . . . seeks broadly to recover for alleged natural resource damages from PFAS across the State, and because . . . PFAS from MilSpec AFFF

- 9 -

and non-AFFF sources have commingled at various locations across Maine," "PFAS deriving from MilSpec AFFF use at military facilities inseparably contributed to the alleged 'non-AFFF' PFAS contamination" (emphases added). 3M supported these allegations, including by quoting from the Complaint in the AFFF case which "expressly allege[d]" that "AFFF would have been used" at five U.S. military facilities in Maine: the Naval Air Station in Brunswick, the Portsmouth Naval Shipyard in Kittery, Loring Air Force Base in Limestone, the Cutler Navy radio facility, and the Maine Air National Guard Base in Bangor. 3M's removal notice also cited independent reports (described in footnotes below) to support its claim that PFAS from AFFF use at four of those five U.S. military facilities had "plausibly migrated" to "off-site locations": (1) from the Naval Air Station in Brunswick through "off-site areas of sewage sludge application"[8]; (2) from the Maine Air National Guard Base in Bangor through "groundwater or surface-water pathways," including to the City of Bangor water treatment plant,[9] and through "AFFF-related waste . . . plausibly shipped

_____

[8] "See Maine DEP PFAS Investigation (Formerly the 'Septage and Sludge Map'), https://www.arcgis.com/apps/webappviewer/index.html?id=468a9f7dd cd54309bc1ae8ba173965c7 . . .; PFAS Preliminary Assessment Report, Brunswick Armed Forced Reserve Center, Maine, at 13-15 (Nov. 2019), https://www.nationalguard.mil/Leadership/Joint-Staff/Personal-Staff/Public-Affairs/Community-Relations/Environmental/PFAS-Library/Maine/FileId/303473/ . . . ."

[9] "See, e.g., PFAS Preliminary Assessment Report, Bangor Training Site, Bangor Maine at 47/85 (Jan. 2020),

- 10 -

off-site to nearby wastewater treatment plants and municipal landfills"[10]; (3) from the Loring Air Force Base through "groundwater or surface-water pathways"[11]; and (4) from the Portsmouth Naval Shipyard through "AFFF-related waste . . . plausibly shipped off-site to nearby wastewater treatment plants and municipal landfills."[12]  These military-facility-originated PFAS "would have commingled with PFAS from non-AFFF sources" such that it "inseparably contributed to the alleged 'non-AFFF' PFAS contamination."[13]

As to the third removal requirement, 3M's removal petition alleged it asserted a "colorable federal defense" for the commingled AFFF contamination, namely "the federal government contractor defense recognized in Boyle v. United Technologies

---

https://www.national-guard.mil/Leadership/Joint-Staff/Personal-Staff/Public-Affairs/Community-Relations/Environmental/PFAS-Library/Maine/FileId/303474/ ('Bangor PI Report') . . . ."

[10] "See, e.g., Bangor PI Report at 23-24 . . . ."

[11] "See, e.g., . . . Final PFAS Remedial Investigation Work Plan, Former Loring Air Force Base at 34-41 (Apr. 2022), available at https://ar.afcec-cloud.af.mil/Search (Loring AFB Maine AR File Number 617813) . . . ."

[12] "See, e.g., . . . Maine DEP, PFAS Residential Sampling and Analysis Plan for the Kittery Municipal Landfill Site (attached to Letter to Town of Kittery), at 1-2 (Dec. 2021), https://www.kitteryme.gov/sites/g/files/vyhlif10031/f/pages/pfas_kittery_landfill_letter-20211214.pdf . . . ."

[13] Maine's non-AFFF Complaint did not name any of the sites that 3M later alleged as contaminated by commingled AFFF and non-AFFF in its notice of removal.

- 11 -

Corp., 487 U.S. 500 (1988), which bars the State from establishing tort liability for the design and manufacture of MilSpec AFFF and for the provision of warnings for the product."

On May 25, 2023, Maine moved to remand to state court, which 3M opposed.[14]  On July 26, 2023, the district court granted Maine's motion to remand, holding that 3M lacked a colorable federal defense, and it denied 3M's motion to stay.  3M timely appealed the remand order, but not the stay denial order, to this court on August 23, 2023.

## C.

On August 12, 2025, in interrogatory responses filed during discovery in the remanded state court litigation, Maine identified 910 specific sites at issue well beyond the original 22 example sites.  3M filed its second removal petition on September 8, 2025, in federal court in order "to preserve its right to a

---

[14] On June 8, 2023, 3M also moved to stay a ruling on the remand motion until the Judicial Panel on Multidistrict Litigation overseeing the ongoing AFFF MDL could rule on 3M's June 7, 2023, motion to transfer this case.  In its filings supporting remand and opposing a stay, the State included a sworn declaration from Victoria Eleftheriou, the Deputy Director of DEP's Bureau of Remediation and Waste Management. As the district court explained in its remand order, the declaration "essentially review[ed] . . . specific sites that are the subject of the [n]on-AFFF contamination litigation and represent[ed] that there is no evidence of AFFF contamination in those PFAS sites."  3M Co., 2023 WL 4758816, at *3.  However, 3M's second notice of removal, submitted to this court in a 28(j) letter, plausibly alleges commingled contamination at one of the sites named in Maine's non-AFFF Complaint, the Juniper Ridge Landfill.

- 12 -

federal forum based upon the new facts presented by the State's responses to [its] interrogatories" just described, where Maine identified 910 sites at issue in this case. This petition stated that one of the 910 sites, the Brunswick/Topsham Water District (BTWD) water system, "is reported to have been contaminated by MilSpec AFFF." 3M substantiated this with quotations from the BTWD's own investigation of its PFAS contamination that indicated "the source [of PFAS] was coming from the former Naval Air Station Brunswick (NASB),"[15] and the report that the PFAS found at NASB "were used in the formation of aircraft firefighting foams that were historically used by the Navy"[16] from the U.S. Environmental Protection Agency.[17]

### D.

On September 24, 2025, 3M filed a further supplemental removal petition in federal court after "[f]urther review of the

---

[15] "Special Edition Water Quality Report Fall 2024, Brunswick & Topsham Water Dist., available at https://www.btwater.org/special-edition-wq-report . . . ."

[16] "Brunswick Naval Air State Brunswick, ME, United States Environmental Protection Agency, available at https://cumulis.epa.gov/supercpad/SiteProfiles/index.cfm?fuseaction=second.cleanup&id=0101073."

[17] In a 28(j) letter, the State reported that after 3M's second notice of removal, Maine had learned that "BTWD has settled its claims against 3M for PFAS in its drinking water as part of a nationwide class action settlement with public water systems." See In re Aqueous Film-Forming Foams Prods. Liab. Litig., No. 2:18-MN-2873-RMG, 2024 WL 1341122, at *20 (D.S.C. Mar. 29, 2024). Maine stated and admitted that "the sufficiency of the evidence of alleged cross-contamination with AFFF at BTWD" and "the legal

- 13 -

ongoing discovery ha[d] revealed at least six additional sites plausibly linked to MilSpec AFFF" for which "Maine seeks recovery in this lawsuit despite its purported disclaimer." 3M alleged the first two of the six additional sites, the Hawk Ridge Compost Facility and the Juniper Ridge Landfill sites, are plausibly contaminated by AFFF by way of "water from BTWD [(the site discussed in the second removal petition)] that had been reportedly contaminated with PFAS from MilSpec AFFF" which "flows into the Brunswick Sewer District ('BSD') . . . ultimately resulting in BSD's production of . . . sludge." "According to a 2022 report, BSD disposed of" that sludge "at both the" Hawk Ridge Compost Facility and the Juniper Ridge Landfill.[18] The third additional site, the Androscoggin River, where the State "identif[ied] 'fish fillet' as the 'resource at issue,'" is "partially located downstream from the . . . Navy Air Station at Brunswick," and "[b]ecause fish can travel both up and downstream, the alleged PFAS contamination of the Androscoggin River plausibly derived, at least in part, from MilSpec AFFF." The Aroostook River and the Little Madawaska River, the fourth and fifth additional sites, are

significance of this issue" "will be presented to the district court at the appropriate time." From this Maine argues, mistakenly, that "it would be improper" for this court "to make assumptions based on BTWD."

[18] "See 2022 Annual Report at 6, Brunswick Sewer Dist., https://www.brunswicksewer.org/2022%20BSD%20Annual%20Report%201.pdf . . . ."

- 14 -

both "located downstream from Loring Air Force Base" so "[g]roundwater and surface water from the military site plausibly flows into the two rivers through the brooks and streams surrounding the base," where they could have "subsequently contributed to the alleged PFAS contamination of the fish." The Penobscot River, the sixth additional site, is "located partially downstream from the Maine Air National Guard Base in Bangor," so AFFF contamination could "plausibly flow" to that site through "an adjacent stream."

## II.

This Court "review[s] de novo the district court's jurisdictional determination on removal." Government of Puerto Rico v. Express Scripts, Inc. ("Gov't of Puerto Rico") 119 F.4th 174, 184 (1st Cir. 2024)(quoting Moore v. Elec. Boat Corp., 25 F.4th 30, 34 (1st Cir. 2022)).

The federal officer removal statute, § 1442(a)(1), allows a state court action to be removed if the suit is against or directed to:

> The United States or any agency thereof or any officer (or any person acting under that officer) of the United States or of any agency thereof, in an official or individual capacity, for or relating to any act under color of such office or on account of any right, title or authority claimed under any Act of Congress for the apprehension or punishment of criminals or the collection of the revenue.

28 U.S.C. § 1442(a)(1) (emphases added).  The text of the statute requires that removing defendants must have been "acting under" a federal officer (uncontested here), and the state court suit must be "for or relating to" acts performed under the color of that office (also known as the nexus requirement).

In Mesa, the Court interpreted the statute as requiring that the defendant's notice of removal contain "a colorable federal defense."  489 U.S. at 129.  Mesa held that it is the colorable federal defense which raises "a federal question in the officer's removal petition that constitutes the federal law under which the action against the federal officer arises for Art. III purposes." Id. at 136.  Assuming a defendant has met the other requirements of Section 1442(a)(1), as 3M does here, that colorable federal defense "serves to overcome the 'well-pleaded complaint rule' which would otherwise preclude" federal jurisdiction over the removed case.  Id.

In Acker, the Supreme Court held that the removing party's "theory of the case" must be "credit[ed]," 527 U.S. at 432, for purposes of assessing whether there was a sufficient "nexus . . . 'between the charged conduct and asserted official authority'" to support removal under § 1442(a)(1).  Id. at 431 (quoting Willingham v. Morgan, 395 U.S. 402, 409 (1969)).[19]  The

---

[19] In Acker, the defendants were federal judges who removed their state prosecution for nonpayment of a professional licensing

Court also rejected the argument that for a defendant to show it had a colorable federal defense, it had to show it had a "clearly sustainable defense." Id. at 432 (quoting Willingham, 395 U.S. at 407). The Court held that such a higher standard would "defeat the purpose of the removal statute." Id. The Supreme Court instructed that the federal officer removal statute must be interpreted broadly and "rejected a 'narrow, grudging interpretation' of the statute." Id. at 431 (quoting Willingham, 395 U.S. at 407). Significantly, the Court held that "one of the most important reasons for removal is to have the validity of the defense of official immunity tried in a federal court." Id. (quoting Willingham, 395 U.S. at 407). Accordingly, courts must "credit the [removing defendants'] theory of the case for purposes" of assessing whether a defense is colorable. Id. at 432. And the defendants had the right "to have the validity of the defense . . . tried in a federal court," regardless of whether the defense succeeds on the merits. Id. (quoting Willingham, 395 U.S. at 407).

As to disclaimers meant to defeat federal officer removal, Gov't of Puerto Rico set out this circuit's "disclaimer

_____

tax to federal court. 527 U.S. at 427. Their theory of the case was that the tax, and thus the suit over its nonpayment, was for their performance of their federal professional duties and that the tax was "in violation of the intergovernmental tax immunity doctrine." Id. at 431.

- 17 -

doctrine" rules for determining whether a plaintiff's purported disclaimer of "claims that would serve as the basis for removal" successfully defeats a defendant's assertion of federal officer removal. 119 F.4th at 186. Consonant with Supreme Court precedent, Gov't of Puerto Rico held a federal court's "task includes 'credit[ing]' th[e] [removing] party's 'theory of the case' for removal," id. at 189 (first alteration in original) (quoting Acker, 527 U.S. at 432), and only then determining whether under that theory of the case, the plaintiff's disclaimer successfully "eliminate[s] any basis for federal officer removal," id. at 187. This court contrasted "express disclaimers," which eliminate any such basis and thus prevent removal, with waivers that are merely "artful pleading," which do not. Id. at 187. The court explained that such disclaimers "come in a few varieties," including ones that: (1) "require[] a state court to determine the nexus 'between the charged conduct and federal authority,'" id. at 188 (quoting Willingham, 395 U.S. at 409)[20]; (2) "force federal contractors to prove in state court that they were acting under the direction of the government," id. at 187-188 (citation omitted); or (3) "disavow[] claims based on a defendant's acts or omissions carried out under color of office, but . . . nonetheless, s[eek] to recover based on a defendant's official acts," id. at

_____

[20] The nexus requirement of federal officer removal jurisdiction was not contested in Gov't of Puerto Rico.

- 18 -

188 (first alteration in original) (citation omitted). Gov't of Puerto Rico held such disclaimers "are never credited." Id. at 187. The court reasoned in part that "Congress gave federal officers 'the protection of a federal forum' in which to resolve" "factual disputes about the scope of a defendant's federal obligations." Id. at 189 (quoting Willingham, 395 U.S. at 407). It also reasoned that some of these disclaimers would deprive defendants of their "entitle[ment] to have a federal court weigh in on the validity of th[eir federal] defense." Id. at 190.

Gov't of Puerto Rico applied this disclaimer doctrine to the removal petition of one defendant, Caremark, and reversed the district court's remand of the Commonwealth's lawsuit alleging pharmaceutical industry defendants had unlawfully inflated insulin prices during pricing negotiations. Id. at 180. Puerto Rico's complaint disclaimed "relief relating to any federal program . . . or any contract related to a federal program." Id. at 189 (quoting complaint). Caremark's theory of the case was that "it negotiate[d] rebates for the federal government [under the Federal Employees Health Benefits Act (FEHBA)] and private client simultaneously." Id. at 194. Crediting that theory, the court also held that Puerto Rico's disclaimer failed to negate Caremark's colorable federal FEHBA preemption defense for those alleged joint negotiations, and that remand would impermissibly "foreclose

- 19 -

Caremark's right to have a federal court evaluate its 'colorable' preemption defense." Id. at 191.

Gov't of Puerto Rico built on Moore v. Electric Boat Company, 25 F.4th 30 (1st Cir. 2022), a federal officer removal case this court decided after Congress's 2011 amendment of the nexus requirement in § 1442(a)(1). Before this amendment, removable suits had to be "for any act under color of [federal] office." See Removal Clarification Act of 2011, Pub. L. No. 112-51, § 2(b)(1)(A), 125 Stat. 545 (amending 28 U.S.C. § 1442(a)(1)). But Congress expanded this nexus requirement to allow removal of suits "for or relating to any act under color of [federal] office." 28 U.S.C. § 1442(a)(1) (emphasis added); see also § 2(b)(1)(A), 125 Stat. at 545. Moore held that "[t]he First Circuit nexus standard [for federal officer removal] is not a causal requirement and is not to be understood as anything more than a 'related to' nexus." Id. at 35. Moore held that the district court had erred when it applied a "'causal link' standard" because a causal "standard . . . is far narrower than the proper standard under § 1442(a)(1), as amended in 2011 when Congress changed the provision." Id. at 34.[21] Moore also held that "a

_____

[21] Moore reversed the district court's remand, finding that there was a "related to" nexus between the defendant's work as a federal contractor building ships for the Navy, and the plaintiff's charge of asbestos exposure during ship construction, because "[t]he Navy oversaw every aspect" of the ship's construction. Id. at 35.

federal defense is colorable unless it is 'immaterial and made solely for the purpose of obtaining jurisdiction' or 'wholly insubstantial and frivolous.'" Id. at 37 (quoting Latiolais v. Huntington Ingalls, Inc., 951 F.3d 286, 297 (5th Cir. 2020) (en banc)).

### III.

The district court's remand order here was error for several reasons under the precedent discussed above.

We must credit 3M's theory that PFAS contamination from sources for which 3M admittedly has a federal contractor defense has commingled with and so has become invisible with the PFAS contamination in natural resources and property which are broadly alleged in Maine's statewide non-AFFF Complaint. Resolution of Maine's Complaint requires addressing whether and to what extent such contamination from AFFF sources has commingled with non-AFFF. The State itself has conceded that its case will require a court to determine whether the source of any PFAS contamination at a given site can be attributed to AFFF. As the State has alleged in its briefing, "[i]f the State fails to prove [to a court] that the PFAS contamination came from a non-AFFF source at a particular location, then it cannot recover for that location."[22] As 3M

---

[22] The State tried to draw a distinction at oral argument between the determination of whether PFAS contamination at a site is attributable to AFFF at all, which Maine acknowledged its case requires, and "allocation" of contamination between AFFF and non-

- 21 -

argues, "whenever [3M] attempts to show -- either through cross-examination during Maine's case in chief or through the introduction of evidence during the defense case -- that PFAS contamination of particular sites or natural resources in Maine was caused in whole or in part by MilSpec AFFF," 3M will necessarily raise its federal contractor defense, which is a colorable defense. The court thus also may be required to resolve commingling between federal MilSpec AFFF, for which 3M has a federal contractor defense, and non-federal AFFF, for which it does not.

From our holding that 3M has demonstrated a colorable federal defense on these facts, it follows that 3M has met the nexus requirement. Indeed, Maine to its credit has not argued that if 3M has a colorable federal defense, 3M nonetheless does not meet the nexus requirement, and so Maine has waived any such contention. See, e.g., Thompson v. Barr, 959 F.3d 476, 490 n.11 (1st Cir. 2020). As Maine likely recognizes, any such argument would have been without merit. For the reasons explained above, on these facts Maine's suit has a "related to" nexus to the acts

---

AFFF sources, which it claims is not required. We do not see a meaningful distinction for purposes of this case, as the determination of whether the PFAS contamination at a site is zero percent or some amount more than zero percent attributable to AFFF is itself a source allocation determination.

as to MilSpec AFFF, which 3M took at the instruction of federal officers.

The State's disclaimer is not an "express" waiver under Gov't of Puerto Rico because, for example, it fails to "clearly carve[] out certain factual bases, whether by time span or location, such that any alleged injury could not have happened under the direction of a federal officer." Gov't of Puerto Rico, 119 F.4th at 187 (alteration in original) (emphasis added) (citation omitted). Maine attempts to distinguish Gov't of Puerto Rico on factual grounds, arguing "there is no joint [3M] conduct towards federal and private parties" here, as 3M's production of AFFF for the military was separate from its non-AFFF production. This argument fails because Maine misapprehends how Gov't of Puerto Rico defines effective "express" disclaimers in contrast to "artful pleading" disclaimers. Gov't of Puerto Rico holds a disclaimer is merely artful pleading where it would leave "a state court to determine the nexus 'between the charged conduct and federal authority.'" Id. at 188 (quoting Willingham, 395 U.S. at 409). Maine has conceded the MilSpec AFFF was produced under federal direction.[23]

---

[23] We also hold that the disclaimer in Maine's Complaint is not unambiguous and so is not "express" as required by Gov't of Puerto Rico. 119 F.4th at 187. The Complaint's text attempts to disclaim recovery for "contamination and injury related to [AFFF]," which is susceptible to different meanings and so is ambiguous.

The federal officer removal statute further entitles 3M to have a federal court adjudicate the scope of its federal contractor defense for the allegedly commingled PFAS contamination. Section 1442(a)(1) guarantees 3M "'the protection of a federal forum' in which to resolve th[e]se disputes" as well as the "opportunity to present [its] version of the facts" before a federal judge. Id. at 189 (quoting Willingham, 395 U.S. at 407, 409). The remand of these determinations to Maine state court, in contrast, contravenes "one of the most important reasons for removal[,] [which] is to have the validity of the defense . . . tried in a federal court." Acker, 527 U.S. at 431 (quoting Willingham, 395 U.S. at 407). This purpose would be defeated were there state and federal court actions deciding the same PFAS contamination source issues alleged by Maine.[24]

---

[24] The Fourth Circuit's reasoning in Maryland v. 3M Co., 130 F.4th 380 (4th Cir. 2025), also supports the result we reach. Maryland and South Carolina, like Maine, brought two mirror-image suits, an AFFF suit and a non-AFFF suit, also against 3M. See id. at 385. The Fourth Circuit reversed the remand of the States' non-AFFF lawsuits where the States' disclaimers of AFFF contamination recovery did not disclaim recovery at commingled sites. See id. at 390-392. Quoting and applying Gov't of Puerto Rico's holding that "[a] disclaimer that requires a state court to determine the nexus 'between the charged conduct and federal authority' is not a valid means of precluding removal," id. at 389 (quoting Gov't of Puerto Rico, 119 F.4th at 188), the Fourth Circuit ruled that remand would impermissibly require state courts to determine just that nexus to resolve the "difficult factual question" of AFFF apportionment at commingled contamination sites, id. at 391.

Maine relies on People ex rel. Raoul v. 3M Co., 111 F.4th 846 (7th Cir. 2024), but that case does not help it. First, Raoul

- 24 -

The district court's order remanding the matter to the State of Maine Superior Court for Cumberland County is reversed, and the district court is instructed to order this removed case be promptly returned to the U.S. District Court. We further instruct

---

agrees with this court that 3M would have "a colorable federal defense" in suits where "a factfinder would need to apportion the contamination between that stemming from [non-AFFF PFAS] (which would not be subject to the government contractor defense) and that sourced from AFFF (which would potentially be subject to the defense)." Id. at 848. Raoul is also factually and legally distinguishable from this case. Illinois's remanded suit sought to hold 3M liable for PFAS contamination stemming only from non-AFFF PFAS production at a single Illinois facility, in contrast to the broad statewide nature of Maine's lawsuit. See id. Finally, to the extent that Raoul can be read to defeat removal on the basis that a state court can decide whether there is any AFFF contamination, and thus any nexus to federal authority, at a site where the removing defendant has plausibly alleged commingling, the Seventh Circuit's holding conflicts with this court's governing law under Gov't of Puerto Rico, which does not permit "a state court to determine th[at] nexus," 119 F.4th at 188.

Also misplaced is Maine's reliance on the Ninth Circuit's decision in California ex. rel. Harrison v. Express Scripts, Inc., No. 24-1972, 2025 WL 2586648 (9th Cir. Sept. 8, 2025). That case concerns an entirely different factual situation: pharmaceutical industry defendants alleged to have caused opioid-related tortious harms. See id. at *1. Beyond that, the Ninth Circuit in Harrison itself expressly distinguished the "unique facts" of commingled PFAS contamination cases like Maryland, where "the source of the contaminant might be difficult to identify." Id. at *14. Further, other points of the Ninth Circuit's reasoning conflict with First Circuit rules. Harrison upheld remand even though it would require a state court to "calculate proportions of tortious harms attributable to federal versus non-federal sources." Id. Gov't of Puerto Rico says the opposite: a plaintiff cannot deprive defendants of a federal forum with artful pleading that would leave "a state court to determine the nexus 'between the charged conduct and federal authority.'" Gov't of Puerto Rico, 119 F.4th at 188 (quoting Willingham, 395 U.S. at 409).

that the district court must resume jurisdiction over the case for further proceedings, and that should the Judicial Panel on Multidistrict Litigation choose to transfer this case, including to the ongoing In re: Aqueous Film-Forming Foam Products Liability Litigation (MDL No. 2873), then further proceedings would occur in the transferee court.

So ordered.